IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ANGELA BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 11-1185-CV-W-ODS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER AND OPINION AFFIRMING**
**COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in March 1982, has earned her GED, and has no prior work experience. She filed a previous application for benefits, which was denied on November 19, 2009. She filed the instant application for Supplemental Security Income benefits on January 13, 2010, alleging an onset date of November 20, 2009.

Plaintiff's primary allegations relate to her back problems and fibromyalgia. Her medical history reveals treatment for back pain as far back as May 2000 arising from a fall from a merry-go-round when Plaintiff was twelve years old. As noted this history did not support a finding of disability through November 19, 2009. The Court will begin summarizing the medical evidence starting at a point closer to the alleged onset date. In January 2009, Plaintiff began receiving treatment at the Center for Advanced Pain Management ("APM") from Dr. Sadie Holland and Dr. Jessica Vanbibber, and during

that first appointment she received an epidural injection. R. at 451-54. In February 2009, a review of prior MRI results revealed a "wedge compression fracture deformity of the L3 vertebral body superior endplate" and "mild bulging of the disk at L2-3 resulting in slight fattening of the thecal sac" but without disk extrusion, stenosis, or nerve impingement. Previous complaints of leg pain had resolved and her chief complaint was muscle cramps, so she was prescribed a muscle relaxer. R. at 448-49.

On July 1, 2009, Plaintiff saw Dr. Holland at Cox Medical Center, reporting that the pain injection (which provided 50% relief) had worn off in the past few weeks. Her condition was described as having deteriorated and another epidural injection was scheduled. R. at 258-59. This was performed on July 7, and another injection was administered on July 29. R. at 254-57. On September 1, Plaintiff reported that the injections did not help, and a surgical consultation was recommended and she was referred to Springfield Neurological and Spine Institute ("Springfield Neurological"). R. at 251-52. On November 11, Plaintiff saw Dr. Chad Morgan at Springfield Neurological and told him she was experiencing pain in the back "with intermittent radiation" to her legs. She described the pain "as a constant stiffness with intermittent aching [and] throbbing pains" that were worse with walking or standing but that improved when she laid flat or changed positions. She rated the pain at an 8 on a scale of one to ten. R. at 311. Plaintiff told Dr. Morgan the pain affected her sleep, prevented her from walking more than a quarter of a mile, sitting for more than an hour, standing for more than an hour, and to traveling for more than two hours. However, she could "manage [to lift] light to medium weights if they are conveniently postioned" and pain medication provided "complete relief from pain." R. at 312-13. Upon examination, Plaintiff demonstrated a normal range of motion in the cervical and lumbar spine and extremities, normal gait, an absence of tenderness in the extremities, normal strength in the extremities, and no deficiencies in motor abilities. In fact, no limitations or abnormalities were revealed during the exam, which Dr. Morgan characterized as "normal." Dr. Morgan found "[e]vidence of multilevel degenerative disc disease and spondylosis . . . without high-grade neural compression and no evidence of gross spinal deformity" based on an MRI from 2007. Surgical options were discussed, as well as non-surgical options including weight management (Plaintiff was 5'7" and weighed 257

pounds), exercise, medication, injections, and physical therapy. R. at 313-14. On November 16, Plaintiff returned to Springfield Neurological and saw Dr. Jeff Woodward. Upon examination, Dr. Woodward noted "[n]o objective neurologic deficits noted on physical examination today," prescribed neurontin, and scheduled an appointment for an EMG for her legs. R. at 309.

As stated earlier, Plaintiff's alleged onset date is November 20, 2009, or nine days after her appointment with Dr. Morgan and four days after her appointment with Dr. Woodward. In December, Plaintiff underwent the EMG arranged by Dr. Woodward; the results were normal. R. at 305. She returned to Springfield Neurological on February 16, 2010, reporting that the neurontin was "helping with the pain" but it wore off near the end of the day. The dosage was increased. R. at 338-39. Four weeks later Plaintiff reported that the increased dosage had not helped much and she rated the pain at a 7 on a one to ten scale. An MRI was arranged and Plaintiff was told to continue doing home exercises and taking neurontin. R. at 335-36. Plaintiff was to return in one week (presumably for reasons related to the anticipated MRI), but there are no more records from Springfield Neurological.

On April 27, 2010, Plaintiff was sent (by whom is not clear; apparently, by Dr. Vanbibber) for a rheumatology evaluation at the Ferrell-Duncan Clinic, which was conducted by Dr. Joseph Mayus. The impetus for this visit was increased pain in her hands. Dr. Mayus planned to arrange for a complete blood count, metabolic profile, and other tests, but the Record does not indicate the results of these endeavors. R. at 357-60. Plaintiff returned in July, at which time Dr. Mayus diagnosed her as suffering from fibromyalgia and elbow tendinitis; he prescribed carisoprodol (a muscle relaxer) and told her to return in three months. R. at 354-56.

On October 3, Dr. Mayus completed a form identifying the trigger points satisfying his diagnosis of fibromyalgia; all of the trigger points were in Plaintiff's thighs or above. The form also indicates Plaintiff would be expected to have "widespread pain for three or more months" during which time she could work four hours per day, stand for two hours per day and thirty minutes at a time, sit for four hours per day and one hour at a time, lift ten pounds occasionally and five pounds frequently, and could only occasionally bend, stoop, or lift her arms above shoulder level. R. at 391-92. Plaintiff

3

returned for her third visit to Dr. Mayus four days later, complaining of cramps in her legs and ribs and chronic fatigue. Upon examination, Plaintiff exhibited a normal range of motion in her hips, a "normal-appearing walk," and no other limitations except "[t]ender points at trapezius . . . scapular spine, upper T-spine, across the sacrum, [and] SI joints." Some prescriptions were added and she was told to return in three to four months. R. at 399-400. There is no record that she ever returned to Dr. Mayus. In January 2011, Dr. Mayus completed a "Pain Questionnaire" indicating Plaintiff's pain was of sufficient severity to interfere with her ability to focus or concentrate and opining that she would probably miss an average of ten days of work a month due to the physical or mental effects of pain. R. at 395.

Meanwhile, Plaintiff had continued seeing Dr. Vanbibber. During some of these visits Plaintiff complained about numbness in her hand, but during none of them did she discuss any problems in her back, neck, arms or legs. R. at 369-88. In June 2010, Plaintiff told Dr. Vanbibber that Dr. Mayus diagnosed her as suffering from fibromyalgia. Dr. Vanbibber described Plaintiff as being "[i]n no acute distress." She also indicated she was "[n]ot convinced this is fibromyalgia, however, will try amitryptiline qHS and monitor for improvement." R. at 367-68. On August 18, Plaintiff went to Dr. Vanbibber's office but had no complaints. R. at 363-64. She returned in October 2010, complaining that for the last two months (or since her last visit) she experienced headaches, nausea and light sensitivity. She also reported feeling sad and depressed. Dr. Vanbibber prescribed Effexor for depression and Fioricet (a combination of acetaminophen, butalbital and cafeeine) for the headaches. Dr. Vanbibber's notes also indicate Plaintiff was taking oxycodone. R. at 420-21. In November, Plaintiff reported that she was undergoing vocational rehabilitation to try to become employable. Plaintiff was also on a smoking cessation program. Her Effexor was increased. R. at 417-18. In January 2011, Dr. Vanbibber's notes reflect that Plaintiff was experiencing "[s]ocial problems at home," including problems with her marriage that had been ongoing for years. Dr. Vanbibber "encouraged [Plaintiff] to ttalk with husband and psychologist," but it is not clear that Dr. Vanbibber was still prescribing Effexor, as this medicine is not listed with Plaintiff's other prescriptions. R. at 410-11. In February 2011, Plaintiff reported plans to leave her husband. R. at 404.

4

During the administrative hearing, Plaintiff testified that she is unable to work due to fibromyalgia and back problems. R. at 32. She stated she was in constant pain from her tailbone to the middle of the back, and had been taking oxycodone for the last three months. R. at 33. She also reported being depressed: she cried over "little things" and felt unloved. R. at 33. She estimated that she could sit for thirty minutes at a time before having to stand up, stand for thirty to forty-five minutes before experiencing tingling in her legs and popping in her back, and could walk for a block. R. at 36. She lies down approximately four times a day for thirty to sixty minutes in order to relieve pain. R. at 38. She reported daily headaches and anxiety or panic attacks on a daily basis. R. at 38-39.

A vocational expert ("VE") also testified. The ALJ posed a hypothetical assuming a person of the claimant's age and education with no prior work experience who was capable of lifting ten pounds occasionally and less than ten pounds frequently, standing or walking for two hours per day, sitting six hours per day, and "[d]ue to mental impairments and side effects of medication . . . would be limited to understanding, remembering, and carrying out routine step instructions." The hypothetical also limited the person's exposure to dust, fumes, temperature extremes, and other environmental conditions, as well as the claimant's ability to work near vibrations, dangerous machinery, and at unprotected heights. The VE testified such an individual could work in certain unskilled sedentary positions, such as final optical good assembler, stem mounter, or a waxer. The VE further testified that these jobs would permit no more than two absences a month "if those absences were a regular ongoing occurrence. R. at 40-41. The ALJ took administrative notice of the fact that Dr. Mayus's opinions would preclude Plaintiff from performing any work. R. at 41-42.

The ALJ found Plaintiff retained the residual functional capacity described in the hypothetical question he posed to the VE. R. at 18. He found Plaintiff suffered from a medically diagnosable impairment but the evidence did not support the degree of limitations she claimed. He noted her daily activities consisted of caring for three children under the age of twelve and that she drove, shopped for groceries, and that she was able to care for herself. R. at 19-20. Plaintiff's medical records did not consistently reflect problems related to depression and anxiety, much less problems of

5

the severity she claimed. Most of Plaintiff's mental/emotional problems were situational in that they were related to difficulties in her marriage. R. at 20. With respect to Plaintiff's physical ailments, the ALJ found Plaintiff to be "somewhat credible" but nonetheless concluded Plaintiff overstated her limitations. Medical tests consistently indicate Plaintiff has normal muscle tone and strength, normal gait, and normal range of motion. Based his findings about Plaintiff's functional capacity and the VE's testimony, the ALJ found Plaintiff could perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A. Failure to Defer to Dr. Mayus's Opinion

Plaintiff first contends the ALJ erred in failing to defer to Dr. Mayus's opinion. Generally speaking, a treating physician's opinion is entitled to deference. However, the Court is not convinced Dr. Mayus qualifies as a treating physician for purposes of this rule. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation

6

omitted).  There are only two documented examinations by Dr. Mayus before he offered his October 2010 opinion regarding Plaintiff's limitations.  His last opinion, rendered in January 2011, was offered approximately three months after he last saw Plaintiff.  He saw Plaintiff no more than four times in total, and Plaintiff's regular doctor – Dr. Vanbibber – did not believe Plaintiff suffered from fibromyalgia.  Dr. Mayus's limited history with Plaintiff does not justify characterizing him as a treating physician.

Even if Dr. Mayus is a treating physician, this does not mean his opinion must be accepted.  A treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record.  E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Dr. Vanbibber's opinion that Plaintiff did not suffer from fibromyalgia is entitled to some weight.  Similarly, Dr. Vanbibber's findings of normal muscle tone, normal strength, normal gait and normal range of motion provide valid reasons to discount Dr. Mayus's opinion.  Finally, Plaintiffs' complaints to Dr. Vanbibber are noticeably less severe than those she reported during the administrative hearing.  The Court concludes that even if Dr. Mayus may be regarded as a treating physician, the Record provides sufficient reasons to discount his opinions.

## B.  Sufficiency of the Evidence

Plaintiff argues the ALJ's decision is not supported by sufficient evidence because (1) he relied in inappropriate evidence to develop Plaintiff's residual functional capacity and (2) unfairly discounted Plaintiff's subjective complaints.  The Court disagrees.

Starting first with the ALJ's determination of Plaintiff's credibility, it must be remembered that the critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences.  E.g., House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994).  The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

7

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of
> claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence
> does not fully support them.
>
>
> The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just
> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
>> 1. The claimant's daily activities;
>>
>> 2. the duration, frequency and intensity of the pain
>>
>> 3. precipitating and aggravating factors;
>>
>> 4. dosage, effectiveness and side effects of medication;
>>
>> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

On appeal, Plaintiff identifies various reasons why the ALJ should have found she suffers from pain – but this is not the critical issue. More importantly, the ALJ considered all of the appropriate factors and found Plaintiff suffers from pain. The ALJ

did not believe Plaintiff's testimony regarding the extent of pain, but there is no portion of the Record that compelled the ALJ to fully credit Plaintiff's testimony and the Record provides substantial evidence supporting the ALJ's decision regarding Plaintiff's credibility on this issue.

Plaintiff's argument regarding her residual functional capacity improperly assumes a doctor must render an opinion that precisely matches the ALJ's findings. While "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). It is simply not true that the RFC can be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). Evidence of Plaintiff's actual daily activities and the medical evidence that existed (particularly Dr. Vanbibber's treatment notes and records) was sufficient to support the ALJ's determination about Plaintiff's capabilities.

## III.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE:  October 23, 2012            UNITED STATES DISTRICT COURT